Filed 12/21/21  P. v. King CA2/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. SCOTT LEWIS KING, Defendant and Appellant. | B288298 (Los Angeles County Super. Ct. No. GA085329) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael D. Carter, Judge.  Affirmed and remanded with directions.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Scott Lewis King appealed the judgment entered following a jury trial in which he was convicted of first degree murder. (Pen. Code,[1] § 187, subd. (a).) The jury also found true the gang allegation pursuant to section 186.22, subdivision (b)(1)(C) and three firearm allegations pursuant to section 12022.53, subdivisions (b), (c) and (d). The trial court found appellant had suffered a prior serious felony conviction for robbery, which qualified as a strike under the Three Strikes law (§§ 667, 1170.12), but the court granted appellant's *Romero*[2] motion to dismiss the strike.

The trial court sentenced appellant to 55 years to life in state prison. The sentence consisted of 25 years to life for the first degree murder conviction, plus a consecutive term of 25 years to life for the firearm enhancement under Penal Code section 12022.53, subdivision (d),[3] and an additional five-year term pursuant to section 667, subdivision (a)(1) for the prior serious felony conviction. The court imposed a $300 restitution fine (Pen. Code, § 1202.4, subd. (b)), imposed and stayed a $300 parole revocation fine (Pen. Code, § 1202.45), and ordered a $30 criminal conviction assessment (Gov. Code, § 70373), and a $40 court security fee (Pen. Code, § 1465.8).

---

[1] Undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[3] The court also imposed and stayed a 10-year term under section 12022.53, subdivision (b) and a 20-year term under section 12022.53, subdivision (c). In addition, the court imposed and permanently stayed a 10-year term under section 186.22, subdivision (b)(1)(C).

On April 27, 2020, we affirmed the judgment of conviction in an unpublished opinion.[4]  Our Supreme Court granted review and subsequently transferred the matter to this court with directions to vacate the prior decision and to reconsider the cause in light of *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).  (Cal. Rules of Court, rule 8.528(d).)  In *Lemcke*, our Supreme Court undertook an examination of CALCRIM No. 315[5] to resolve the following question:  " 'Does instructing a jury with CALCRIM No. 315, which directs the jury to consider an eyewitness's level of certainty when evaluating an identification, violate a defendant's federal and state due process rights?' "  (*Lemcke*, at pp. 653–654.)  While finding no due process violation on the record before it, *Lemcke* "join[ed] other jurisdictions (and the California Commission on the Fair Administration of Justice) in acknowledging that [inclusion of the certainty factor in CALCRIM No. 315] has the potential to mislead jurors." (*Lemcke,* at p. 665.)

On remand, appellant contends that when considered in the context of the entire trial record, including the instructions as a whole, the inclusion of the certainty factor in CALCRIM No. 315 violated his due process rights by lowering the

---

[4] *People v. King* (Apr. 27, 2020, B288298) [nonpub. opn.].

[5] CALCRIM No. 315 instructs in relevant part:

"You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  [¶]  In evaluating identification testimony, consider the following questions:  [¶] . . . [¶]  *How certain was the witness when he or she made an identification?*"  (CALCRIM No. 315, italics added.)

3

prosecution's burden of proof.  We disagree.  Reconsidering the matter in light of *Lemcke*, *supra*, 11 Cal.5th 644, we vacate our prior opinion and affirm the judgment of conviction.[6]

## FACTUAL BACKGROUND

### 1. *Marvin Laguan's murder*

On the evening of August 22, 2011, appellant was at his cousin's house on Mar Vista Avenue in Pasadena with Steven Fleming, Maurice Scudder, and Ricky Vaughns.  After leaving the cousin's house, the four men walked south on Mar Vista together, but when they reached Villa Street, Fleming told Scudder, " 'Just go to Brandy's [*sic*] house.  We going to come over there.  I'll meet you over there.  We're about to go do something.' " Appellant and Fleming continued walking down Mar Vista toward Maple, but feeling something was "fishy" and "weird,"

---

[6] Appellant has also contended:  (1) The trial court prejudicially erred in denying appellant's request for a voluntary manslaughter instruction based on imperfect self-defense; (2) The trial court abused its discretion in refusing to strike the firearm enhancement; and (3) Appellant is entitled to remand for a determination of his ability to pay the restitution and parole revocation fines, the court securities fee, and the criminal conviction assessment.  We continue to reject these contentions and affirm.  We remand the matter to permit the trial court to exercise its discretion pursuant to Senate Bill No. 1393 (Stats. 2018, ch. 1013, § 2) to impose or strike the serious felony enhancement imposed under section 667, subdivision (a)(1).  The trial court is further directed to correct the minutes of the February 21, 2018 probation and sentencing hearing and the abstract of judgment to accurately reflect the court's oral pronouncements.

4

Scudder waited at the corner of Villa and Mar Vista and watched to see where they were going and if they were going to return.

In the meantime, around 9:00 p.m. Cynthia Carrier drove to Mar Vista to pick up her boyfriend, Marvin Laguan, at his friend's apartment located on the east side of the street between Villa and Maple. With her three-year-old son in the backseat, Carrier parked on the west side of the street and remained in the car as she waited for Laguan. Laguan came outside and leaned into the driver's side window to speak with her. As they chatted, Carrier saw Laguan look over his shoulder and look at appellant, who was slowly walking down the east side of Mar Vista toward Maple. Appellant was wearing a dark shirt and a dark unzipped hoodie sweatshirt with the hood pulled up over his head. Appellant stopped and stood in the driveway of the apartment from which Laguan had just come. As the two men eyed each other, Laguan said, " 'What's up?' " to appellant. Carrier could not hear appellant's response. Appellant continued to stare at Laguan, making him uncomfortable and irritated, which prompted Carrier to urge Laguan to hurry up and say goodbye to his friends so they could leave.

Laguan turned and started to walk across the street toward his friend's apartment. His hands were at his sides and he was wearing a short-sleeved T-shirt. He did not have any weapon, and he made no threatening or aggressive gestures toward appellant. As he drew closer to appellant, Laguan said, " 'Where you from?' " in a nonthreatening manner. Suddenly appellant pulled a revolver from the pocket of his sweatshirt and opened fire, shooting Laguan multiple times. Laguan turned around and tried to walk back to Carrier's car. He went to his knees as appellant continued to shoot him. When he had stopped firing,

5

appellant ran down Mar Vista toward Maple. Carrier managed to get Laguan into the backseat of her car and call 911.

Cynthia Dale and her boyfriend Oliver Debats were sitting on their elevated porch facing Mar Vista at the corner of Maple when they heard gunshots. Debats first saw appellant near Carrier's car. After the shooting Dale and Debats saw appellant and another man run south on Mar Vista past their porch and turn west on Maple. The hood of appellant's sweatshirt had come off his head, and he was running awkwardly with his hands in his pockets. As appellant ran past, Dale made eye contact with him and saw him "dead on."[7] At trial, both Dale and Debats identified appellant as the man wearing the hoodie. Dale testified she was "very confident" in her identification.

When Scudder heard the gunshots he ran west on Villa to Brandi's apartment, which was on Wilson one block west of Mar Vista between Villa and Maple. After the shooting, surveillance footage from a residence on Wilson showed two figures run from Villa into the rear of an apartment building on Wilson. Three to five minutes after Scudder arrived at Brandi's apartment, appellant and Fleming rushed in, nervous and out of breath. They ran to the back of the apartment, and dashed back and forth in and out of the bathroom. Scudder saw that appellant and Fleming had taken a revolver apart and were putting the parts in a towel. Appellant passed the cylinder to Fleming.

---

[7] At the preliminary hearing of King and his codefendant, Steven Fleming, as well as at Fleming's trial in September 2014, Dale identified Fleming as the man with whom she made eye contact.

6

Laguan died due to multiple gunshot injuries. He suffered 10 gunshot wounds, two of which were fatal. Five projectiles, consistent with the .22 long rifle caliber ammunition used in 10-round revolvers, were recovered from Laguan's body. No bullets or casings were found at the scene, and police never recovered a gun.

### 2. *Jail phone calls and visits*

While appellant was in custody following his arrest, several of his telephone calls and conversations with visitors were recorded. In one call, appellant fretted over the number of witnesses against him and the police discovery of the gun used in the shooting. In recorded conversations with visitors, appellant solicited help contacting witnesses, including Fleming, who was the only person he thought could identify him. Appellant also constructed an alibi and instructed his visitor to get Vaughns to corroborate the story.

### 3. *Gang evidence*

Corporal Carlo Montiglio of the Pasadena Police Department testified as the prosecution's gang expert. The expert explained that the "Pasadena Denver Lanes Bloods" is a Bloods gang based in Pasadena known by its initials "PDL." As a Bloods gang, PDL associates with the color red, and its members commonly call each other "Blood." The chief rival of any Bloods gang is a Crips gang, and Bloods gang members often change the "C" in words to a "B" as a sign of disrespect to the Crips. Thus, in written or oral speech, Bloods gang members commonly say words like "bool" for "cool," or "bristol meth" for "crystal meth." In Bloods gang graffiti and tattoos a "K" may be placed after a "C" in a word to signify "Crip Killer."

7

Among PDL's rivals in Pasadena are the "Squiggly Lane Gangster Bloods" and the "Villa Boys Pasadena Trece" gang (Villa Boys). In 2011, PDL and the Villa Boys were engaged in a violent conflict which involved several shootings and murders. Montiglio testified that although the area around Mar Vista and Villa was Villa Boys gang territory, PDL controlled a small section of that area on Mar Vista just north of Villa.

Montiglio identified several of appellant's tattoos as probable PDL gang tattoos. On November 6, 2008, appellant admitted to writing PDL gang graffiti and his moniker "Do Wrong" on a Pasadena bus. Appellant also admitted to a police officer that he was a gang member.

Based on the gang graffiti, appellant's gang tattoos, his gang admission, his regular association with PDL gang members, and his frequent use of gang vernacular in his recorded jail conversations as well as his Facebook messages and postings, Montiglio opined appellant was a member of the Pasadena Denver Lanes Bloods. When presented with a hypothetical scenario based on the facts of the Laguan murder, Montiglio further opined that the murder was committed for the benefit of, at the direction of, or in association with the PDL gang.

## DISCUSSION

### I. CALCRIM No. 315

On remand appellant contends the trial court's instruction pursuant to CALCRIM No. 315 that a witness's level of certainty is a factor to consider in evaluating the accuracy of identification testimony violated his due process rights by lowering the prosecution's burden of proof. In so arguing, appellant relies on *Lemcke*'s determination that inclusion of the certainty factor "has the potential to mislead jurors" (*Lemcke, supra*, 11 Cal.5th at

8

p. 665), while distinguishing *Lemcke* for its finding that the certainty instruction in that case did not render the defendant's trial fundamentally unfair or otherwise violate the defendant's due process rights (*id.* at p. 661). Here, while acknowledging the jury received the same instructions that the trial court gave in the *Lemcke* case, appellant argues that the absence of expert witness testimony to dispel the misconception endorsed by the certainty instruction that the accuracy of an identification is commensurate with the witness's level of certainty rendered appellant's trial fundamentally unfair. We disagree.

*Lemcke* does not support appellant's claim. The lack of expert identification testimony did not make the trial fundamentally unfair because defense counsel at appellant's trial successfully cast doubt on the accuracy of the three eyewitness identifications through vigorous cross-examination establishing that none of the witnesses could accurately identify the shooter at the scene. Indeed, the defense established that all three witnesses identified appellant in a photo lineup only through a process of elimination because he looked "familiar." And Dale twice identified Fleming—at the preliminary hearing and at Fleming's trial—as the man wearing the hoodie with whom she had made eye contact. Moreover, aside from the eyewitness identifications, the prosecution in this case presented convincing evidence of appellant's identity as the shooter.

## A. *The* Lemcke *decision*

In *Lemcke*, our Supreme Court acknowledged that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.'" (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) However, the research also shows that "'jurors . . .

9

tend to overvalue the effect of . . . certainty . . . in determining the accuracy of eyewitness identifications.' " (*Id.* at p. 665.) The court noted that as currently worded, CALCRIM No. 315 does nothing to correct the common misconception that a witness's high degree of certainty in an identification correlates to accuracy. (*Id.* at pp. 647, 666.) Rather, by "merely directing the jury to consider a witness's level of certainty, without any further caveats, [the instruction] effectively operates to reinforce that misconception." (*Id.* at p. 666.) "This is especially problematic because many studies have also shown eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an identification." (*Id.* at p. 647.) And, as the court acknowledged, the danger of misleading jurors increases where the prosecution's case relies almost entirely on the testimony of a single witness who expresses a high degree of certainty in the identification. (*Id.* at p. 666.)

The Supreme Court also warned that "[t]he risk of juror confusion is heightened by the structure of CALCRIM No. 315, which lists witness certainty among numerous other factors the jury should consider when assessing the eyewitness testimony. As written, the instruction implies that each of these factors have a direct, linear bearing on accuracy. For instance, 'How well could the witness see the perpetrator' implicitly prompts the jury to believe that if the witness could see the perpetrator well, the identification should be given more weight, and vice versa; 'How closely was the witness paying attention,' 'Was the witness under stress when he or she made the observation,' 'Did the witness ever fail to identify the defendants,' all do the same. Hearing the certainty instruction in this context increases the risk that the jury will infer certainty operates the same way—as having some

direct relationship with the accuracy of the identification." (*Lemcke*, *supra*, 11 Cal.5th at p. 666.)

Despite the risks of allowing a jury to consider the level of an eyewitness's confidence to determine the accuracy of an identification, *Lemcke* noted that inclusion of the certainty factor in CALCRIM No. 315 does not, by itself, violate due process. (*Lemcke*, *supra*, 11 Cal.5th at pp. 646–647, 661.) A due process violation occurs only if the jury instruction—" ' "in the context of the instructions as a whole and the trial record" ' "— renders the defendant's trial fundamentally unfair, most often by lowering the prosecution's burden of proof. (*Id.* at pp. 647, 655, 661, quoting *People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Our Supreme Court has long held that CALCRIM No. 315 (and its predecessor, CALJIC No. 2.92) does not violate due process because it "does not direct the jury that 'certainty equals accuracy.' " (*Lemcke*, at pp. 647, 655–657; see *People v. Sánchez* (2016) 63 Cal.4th 411, 462.) Rather, "[t]he instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke*, at p. 657.)

The *Lemcke* court's examination of the record before it also revealed sufficient safeguards to prevent the jury from improperly inferring that a witness's certainty in making an identification ensures its accuracy. Our Supreme Court concluded, "when considered ' "in the context of the instructions as a whole and the trial record" ' [citation], . . . listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise

11

amount to a due process violation." (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

Despite the absence of a due process violation in the case before it, *Lemcke* nevertheless determined "there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Lemcke*, *supra*, 11 Cal.5th at p. 669.) To avoid the risk that the current version of the instruction poses, the Supreme Court exercised its supervisory powers to direct California trial courts to omit the certainty factor from CALCRIM No. 315 until the language might be revised to minimize possible juror misdirection on this point. (*Ibid.*)

**B.** *Inclusion of the certainty factor did not violate appellant's due process rights*

*Lemcke*'s rejection of the defendant's due process claim was based on the presence of several safeguards that the court found effectively prevented the jury from improperly inferring the accuracy of an identification from a witness's certainty. These included: (1) The defendant in *Lemcke* presented expert witness testimony to rebut the misconception that certainty equals accuracy by casting grave doubt on the utility of confidence to assess accuracy, and labeling in-trial identification testimony as "particularly meaningless" (*Lemcke*, *supra*, 11 Cal.5th at p. 658); (2) other jury instructions given countered the possibility that CALCRIM No. 315 lowered the prosecution's burden of proof (*ibid.*); and (3) defense counsel had ample opportunity to cross-examine witnesses regarding details and inconsistencies in the identifications which affected accuracy (*id.* at p. 660).

However, nothing in *Lemcke* suggests these elements are prerequisites to a fair trial in which identification is at issue, nor does the absence of any of these safeguards inevitably result in a due process violation. The defense did not present an eyewitness identification expert in this case, even though it could have. Nevertheless, appellant had a full and fair opportunity to test the reliability and accuracy of the three eyewitness identifications through cross-examination, and defense counsel took full advantage of this opportunity.

In the cross-examination of the victim's girlfriend, Carrier, defense counsel elicited testimony that Laguan saw the shooter before she did, but Laguan was blocking her view and she only saw the man in her peripheral vision. Carrier further admitted she was not paying attention to the shooter, and Laguan continued to block her view as he crossed the street and walked toward the man. Although she could describe the shooter's clothing and build, Carrier conceded she could see only his eyes, not his whole face. Carrier also told the police she did not get a good look at the shooter, and could not give a good description because everything had happened so fast. Carrier testified on cross-examination that when she identified appellant from a six-pack photo lineup, she told the officer that she knew none of the other five men was the shooter, but appellant looked most like the person who shot her boyfriend.

On cross-examination Dale admitted that she never actually saw the shooting but had looked up after hearing gunfire to see two men running southbound on Mar Vista. She also conceded she had been unable to identify anyone at the field show-up. Dale testified that she saw one of the men wearing a hoodie and running, but she could not recall what the other

13

person was wearing. When she identified appellant in the photo lineup, she said he looked like the person she saw in the hoodie, but at the preliminary hearing for appellant and codefendant Fleming, Dale admitted to being confused about who was who, and at Fleming's trial she identified Fleming as the person in the hoodie.

Similarly, Debats admitted on cross-examination that he did not actually witness the shooting, but ducked as soon as he heard the noise. When he stood up, he saw two males quickly moving southbound on Mar Vista. One of the men was wearing a hooded sweatshirt and was running with his hands in the pockets. The hood had partially slipped off his head, and Debats could see the right side of his face, but he failed to identify anyone in the field show-up that night. When Debats identified appellant in the photo lineup, he did so stating that he looked "familiar."

The witness certainty factor in CALCRIM No. 315 clearly did not impede the defense's ability to confront these witnesses and challenge their identification testimony. Indeed, by drawing the jury's attention to the witnesses' level of certainty in identifying the perpetrator, the instruction served to highlight the deficiencies in these eyewitness identifications that were revealed in cross-examination.

Moreover, as *Lemcke* emphasized, "the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) Here, some of those factors tended to undermine the accuracy of the witnesses' identifications, as defense counsel forcefully argued to the jury.

In addition, the certainty factor itself allowed the defense to highlight the notable lack of certainty in the witnesses' identifications in the photo lineup and Dale's identification of Fleming as the man in the hoodie with whom she made eye contact.

Our Supreme Court in *Lemcke* found that other instructions given in that case undermined defendant's argument that the certainty language lowered the prosecution's burden of proof and violated his due process rights by denying him a meaningful opportunity to present a complete defense. (*Lemcke*, *supra*, 11 Cal.5th at pp. 658, 660.) These included a general instruction on witness testimony that " '[p]eople sometimes honestly . . . make mistakes about what they remember' and that the jurors were responsible for 'judg[ing] the credibility or believability of the witnesses,' " the instruction that the defendant is presumed innocent, and that the prosecution had the burden of proving all elements of the crime including the identity of the perpetrator beyond a reasonable doubt. (*Id.* at p. 658.) These general instructions were given in this case, too, thus fully apprising the jury of its duties regarding assessment of a witness's credibility and the prosecutor's burden to prove guilt beyond a reasonable doubt. (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) Moreover, CALCRIM No. 315 itself made this burden clear, instructing jurors that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Jurors are presumed to have understood and correctly applied the trial court's instructions unless there is evidence of confusion or the jury requested further guidance on the issue at

hand. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) Moreover, in addition to CALCRIM No. 315, the trial court read CALCRIM No. 226, which, like CALCRIM No. 315, lists numerous factors (12) the jury may consider in evaluating the accuracy of witness testimony. The trial court also read CALCRIM No. 316, which informs the jury how evidence of a witness's prior felony conviction, crime or other misconduct may be considered in evaluating the witness's credibility. And in closing argument, the prosecutor urged the jury to consider all of the facts and circumstances surrounding the witnesses' identifications of appellant in assessing their accuracy and credibility. We find no indication in the record that these instructions confused or misled the jury, and the instructions taken as a whole do not support the conclusion that the jury was encouraged to give any more weight to the certainty factor than to any of the other 26 factors the jury was told to weigh.

The record as a whole shows that the inclusion of the certainty factor as one of 27 factors to be considered by the jury did not render the trial fundamentally unfair. Not only did all three eyewitnesses independently identify appellant from photo lineups, the evidence convincingly pointed to appellant as the shooter. Immediately before the shooting, appellant and Fleming told their friends to go to Brandi's because " 'We're about to go do something.' " Appellant and Fleming then continued walking down Mar Vista toward Maple. About three minutes after the shooting, appellant and Fleming rushed into Brandi's apartment, nervous and out of breath. Appellant had a revolver, the type of gun used in the shooting. As they dashed in and out of the bathroom, appellant and Fleming took the revolver apart and put the parts in a towel. Appellant passed the cylinder to Fleming.

Appellant's recorded jailhouse visits and phone calls also strongly suggested it was appellant, not Fleming, who had shot Laguan to death. Within hours of police indicating to appellant they knew the gun was hidden in Brandi's apartment, appellant exclaimed in a phone call, "They got the gun!" Sometime later in a recorded conversation with an unidentified jailhouse visitor, appellant told the visitor, "Hey, on blood, I need y'all to find that one fat bitch that's saying that she saw me empty the gun shells in the toilet. [¶] . . . [¶] Brandi [phonetic]." When the visitor offered to go to her apartment, appellant said, "Yeah, but I don't, I don't need her threatened though, like—" The visitor responded, "Oh, I ain't threatening her. I just want to, uh, you know me, I don't threaten, bro. I just want to talk to her." Appellant then said he needed someone to talk to Fleming, who was "the only one that could really hurt" him—"the rest of 'em can't identify me. They just know what happened—"

In another jailhouse visit between appellant and someone named Max, appellant tried to construct an alibi and pin the shooting on Scudder and Fleming.

"King:    But I was like that would get me out the whole situation, cuz I said I I was with Brandi, at Brandi's house the whole time. See my P.I. been trying to get information out of Ricky [Vaughns] the whole time, Ricky didn't tell me that Po Po he's supposed to, he didn't tell me that. I cussed him out last time why the fuck you didn't tell me that. My P.I. be trying to find out who had the tah tah tun. Ricky hung up on me. Why you didn't tell me that stupid? You feel me?

"Max:    That nigga's acting weird, bro.

"King:    So please like get in contact with him and tell him that the video where they show Maurice [Scudder] walking,

where they say that's Maurice walking, say that was him . . . walking across Villa. And with a grey hoodie. And that Maurice and Steven [Fleming] walked down Mar Vista and did that, but I was at Brandi house the whole time. That he walked to Brandi house and let me know what happened and he left, he saw Maurice coming and leaving. You feel me?"

"King: . . . Tell Ricky [Vaughns] that the video that shows [Maurice] Scudder walking, say that's him and that Scudder and Steven [Fleming] walked down Mar Vista. Steven did that. That I was always at Brandi's house. That's it. In the video, tell him to make up. Tell them we played basketball before and all that, but he never seen me with a gun. So text him that shit, I know he not going to try to talk to you on the phone. Please. Tell him that's the only thing that can help me, is him throwing blood under the bus. My next trial, blood might try to do that. But he already had a pretrial hearing, they denied it. It finished after I start trial, you feel me? He might try to do this for a deal, or to go home. And you need to know that what Scudder did, they're going to offer that to him again. So by Ricky throwing Blood under the bus, that's the only thing that can help me. And tell him I'm going to get on the stand to corroborate with that."

In sum, when the single, short certainty factor is viewed in the context of the entire record, including the eyewitness identifications and appellant's own incriminating conduct, the jury instructions, and arguments of counsel, we find no fundamental unfairness that deprived appellant of his due process rights or lessened the prosecution's burden of proof. (See *Lemcke, supra*, 11 Cal.5th at pp. 646–647.)

## II. The Trial Court Properly Refused Appellant's Request for a Voluntary Manslaughter Instruction Based on Imperfect Self-Defense

### A. *Proceedings below*

During discussions about the jury instructions, appellant requested CALCRIM No. 571, voluntary manslaughter based on imperfect self-defense. Appellant asserted the instruction was warranted because Laguan had threatened appellant with immediate harm by issuing the gang challenge, "Where you from?" According to appellant, it was a question for the jury whether Laguan initiated the shooting with this challenge and if appellant had a reasonable belief the immediate use of force was necessary to confront such a challenge in rival gang territory. The court responded that the instruction required evidence that " 'the defendant actually believed that the immediate use of force was necessary to defend himself.' " "[T]here has to be evidence of actual belief, not [that the defendant] could have believed it or he should have believed it. . . . I don't think you get that from the gang expert saying this is what gang members believe, especially with the fact that the defense is contesting the fact he was a gang member at all." Although it would allow counsel to revisit the issue, the court warned it would require a showing of appellant's actual belief.

In renewing the request for the imperfect self-defense instruction, the defense argued the evidence showed that a reasonable person could conclude appellant was actually in fear of attack. The court refused the instruction, stating that evidence of a defendant's actual belief in the need to defend against an imminent danger was a prerequisite for the instruction.

19

**B.** *Legal principles*

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).) 'Manslaughter is the unlawful killing of a human being without malice.' (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter." (*People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*); *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

Imperfect self-defense reduces murder to voluntary manslaughter (*People v. Soto* (2018) 4 Cal.5th 968, 970) because when a defendant kills under the actual but unreasonable belief that he is " 'in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048 (*Nguyen*); *People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) As our Supreme Court has explained, imperfect self-defense is a shorthand way of describing one form of voluntary manslaughter; it is not an affirmative defense. (*Simon*, at p. 132.) Thus, in light of the fact that "imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder." (*Ibid.*; *Breverman, supra*, 19 Cal.4th at p. 154.)

It is settled that in a criminal case, even absent a request, "a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the

question is substantial enough to merit consideration by the jury." (*People v. Booker* (2011) 51 Cal.4th 141, 181; *Breverman*, *supra*, 19 Cal.4th at p. 154.)

However, " '[a]n instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " (*Nelson*, *supra*, 1 Cal.5th at p. 538.) "The 'substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak' " ' " (*ibid.*), and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense" (*Simon*, *supra*, 1 Cal.5th at p. 132). "We review de novo a trial court's decision not to give an imperfect self-defense instruction." (*Id.* at p. 133; *People v. Souza* (2012) 54 Cal.4th 90, 113.)

" '[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning [imperfect self-defense] *only if there is substantial evidence to support the defense*." ' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1049.) Accordingly, there must be substantial evidence that, when the defendant acted, he *actually believed* (1) that he was in imminent danger of being killed or suffering great bodily injury, *and* (2) that the immediate use of deadly force was necessary to defend against that danger, but (3) at least one of those beliefs was unreasonable. (CALCRIM No. 571; *People v. Her* (2009) 181 Cal.App.4th 349, 352.)

Our Supreme Court has cautioned that the doctrine of imperfect self-defense "is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that

21

' " ' *must be instantly dealt with.*' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 98.) "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' . . . [¶] . . ." Put simply, the trier of fact must find an *actual* fear of an *imminent* harm.' (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)" (*People v. Trujeque* (2015) 61 Cal.4th 227, 270–271 (*Trujeque*).)

## C. *The trial court was under no duty to instruct on imperfect self-defense*

The trial court properly refused to instruct the jury on imperfect self-defense in this case because there was no evidence that appellant actually believed he was in any danger of immediate harm that had to be dealt with instantly.

Appellant himself did not testify, but relies on Carrier's testimony about the shooting and the prosecution gang expert's testimony about gang culture to argue that there was substantial evidence of appellant's belief that he was in imminent peril to which he needed to respond with deadly force. Specifically, appellant cites the prosecution gang expert's testimony that the question, "Where you from?" is a "form of intimidation" that gang members and those who live in communities with gangs understand as a challenge. Such a challenge could lead to violence—anything from a fight to serious injury or death. Appellant then points to Carrier's testimony that Laguan repeatedly turned his attention from his conversation with

Carrier to look over at appellant. As Laguan walked toward appellant, he said, "What's up," and, escalating the situation, he then asked appellant, "Where you from?" Appellant adds that Laguan was very close to appellant—about six feet away—when appellant responded to Laguan's aggression by opening fire.

Appellant also argues that the jury could have reasonably inferred that appellant subjectively feared he was in imminent danger of great bodily injury or death which called for the use of deadly force based on Montiglio's testimony that walking through a rival gang's territory is a sign of great disrespect, which can be deadly for a member of another gang. According to Montiglio, retaliation for disrespect can consist of "[a]nything as simple as beatings all the way to murders." Appellant thus asserts that because he was walking through the rival gang Villa Boys territory, he "reasonably would have had a heightened sense of the possibility that danger might come his way."

While appellant identifies what might have amounted to a potentially dangerous situation, he fails to cite any evidence showing appellant's subjective state of mind, much less even a suggestion that appellant was in " '*actual* fear of an *imminent* harm' " which called for the use of deadly force. (*Trujeque*, *supra*, 61 Cal.4th at p. 270.) It is true that "the 'substantial evidence of a defendant's state of mind may be found in the testimony of witnesses other than a defendant' " (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82), but such evidence is lacking here. No witness testified that appellant fired on Laguan out of fear or appeared fearful in any way. There was no evidence of any words or statements by appellant in the moments before the shooting, nor evidence of anything he said after the killing to indicate he

23

believed deadly force was necessary to defend himself against an immediate threat posed by Laguan.

In the absence of such evidence to support this element of the voluntary manslaughter instruction, the trial court was under no duty to instruct on imperfect self-defense, and properly declined to do so.

## III. The Trial Court Did Not Abuse Its Discretion in Refusing to Strike the Firearm Allegation

### A. *Proceedings below*

The jury found true all three firearm enhancement allegations under section 12022.53, subdivisions (b), (c), and (d). At sentencing, appellant requested dismissal of the firearm enhancement under section 12022.53, subdivision (d), which carried a consecutive term of 25 years to life. The trial court declined the request, stating: "[T]he court recognizes that it does have the discretion to strike either the allegation as a whole or punishment for the allegation; and in this case, the court in its discretion chooses to do neither." The court specifically found that appellant "fall[s] within the spirit of the gun allegation," and explained in detail how appellant's use of the firearm in this instance made it "so easy" to shoot and kill a stranger from a distance with no provocation or even interaction between them. The court noted that had another type of weapon been used, Laguan might "have had a fighting chance to survive," but because appellant used a firearm, Laguan really had no opportunity to defend himself and no chance of survival. On that basis, the court imposed a consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d).

## B. *The Trial Court Properly Exercised Its Discretion*

Appellant contends the trial court abused its discretion in declining to strike the firearm enhancement because it failed to consider the nature and circumstances of his current crimes and prior convictions, and the particulars of his background, character, and prospects. (See *People v. Williams* (1998) 17 Cal.4th 148, 161.) Instead, according to appellant, by relying on irrelevant factors while ignoring relevant ones, the court did not exercise "informed discretion" and the matter must be remanded for resentencing. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court' "].) We reject the claim.

In *People v. Pearson* (2019) 38 Cal.App.5th 112 (*Pearson*), our colleagues in Division One of this district resolved this issue, noting that when determining whether to strike a firearm enhancement under section 12022.53, subdivision (h) the trial court must weigh the same factors it must consider when pronouncing sentence in the first instance. (*Id.* at p. 117.) "In addition to the factors expressly listed for determining whether to strike enhancements listed in California Rules of Court, rule 4.428(b), the trial court is also to consider the factors listed in California Rules of Court, rule 4.410 (listing general objectives in sentencing), as well as circumstances in aggravation and mitigation under California Rules of Court, rules 4.421 and 4.423. '[U]nless the record affirmatively reflects otherwise,' the trial court is deemed to have considered the factors enumerated in the California Rules of Court. (Cal. Rules of Court, rule 4.409.) Among other factors the court may have considered were that '[t]he crime involved great violence . . . threat of great bodily

harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness,' that the 'defendant was armed with or used a weapon at the time of the commission of the crime,' and that the 'victim was particularly vulnerable.' (Cal. Rules of Court, rule 4.421(a)(1)–(3).)" (*Ibid.*)

Here, by highlighting the fact that appellant used a firearm to shoot a perfect stranger from a distance without even interacting with him and without provocation, the court expressly determined that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" and "[t]he defendant has engaged in violent conduct that indicates a serious danger to society." (Cal. Rules of Court, rule 4.421(a)(1), (b)(1).) The court further took into account the victim's particular vulnerability by noting that Laguan had had no opportunity to defend himself and did not stand a "fighting chance to survive." (Cal. Rules of Court, rule 4.421(a)(3).) And in finding that the murder was committed with a firearm, the court explicitly determined "[t]he defendant was armed with or used a weapon at the time of the commission of the crime." (Cal. Rules of Court, rule 4.421(a)(2).)

Moreover, there is nothing in the record to indicate, much less affirmatively establish that the trial court did not consider other relevant factors it was required to consider. (Cal. Rules of Court, rule 4.409 ["Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"]; see *Pearson*, *supra*, 38 Cal.App.5th at p. 117.)

It is readily apparent on this record that the trial court carefully considered the factors it was required to consider when

26

pronouncing sentence in this case, and its denial of appellant's request to dismiss the firearm enhancement "was squarely within the bounds of the trial court's discretion." (*Pearson*, *supra*, 38 Cal.App.5th at p. 118.)

### IV. Appellant Is Not Entitled to a Hearing to Determine His Ability to Pay the Fines and Assessments

Appellant contends the trial court's imposition of restitution and parole revocation fines as well as the criminal conviction assessment and the court security fee was unconstitutional under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). He thus asserts he is entitled to remand with instructions to stay enforcement of these financial obligations until the People prove that he has the ability to pay them. We reject the claim.

In *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, 329, review granted November 26, 2019, S258946[8] (*Hicks*), we concluded that *Dueñas* was wrongly decided, and we rejected its holding that "due process precludes a court from 'impos[ing]'

---

[8] The California Supreme Court ordered briefing deferred pending decision in *People v. Kopp*, S257844, which presents the following issues:

"(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? (2) If so, which party bears the burden of proof regarding the defendant's inability to pay?" (*People v. Hicks*, S258946, <https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=2302457&doc_no=S258946&request_token=NiIwLSEmXkw8W1BZSCNNTEtIUEQ0UDxTJiBeIz5SUCAgCg%3D%3D> [as of Apr. 15, 2020], archived at <https://perma.cc/G7TN-VLGH>.)

27

certain assessments and fines when sentencing a criminal defendant absent a finding that the defendant has a 'present ability to pay' them."  (Accord, *People v. Petri* (2020) 45 Cal.App.5th 82, 92 [quoting *Hicks*, at p. 329:  "The 'imposition of these financial obligations has not denied defendant access to the courts' and 'their imposition has [not] . . . result[ed] in defendant's incarceration' "]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067–1068 ["*Dueñas* was wrongly decided"]; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923, 926–927 [*Dueñas*'s due process analysis does not justify extending its "broad holding" beyond its "extreme facts"]; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279–282 (*Kingston*) [no due process violation in imposition of assessments and restitution fine without first ascertaining defendant's ability to pay them]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96–97 ["there is no due process requirement that the court hold an ability to pay hearing before imposing a punitive fine and only impose the fine if it determines the defendant can afford to pay it"], review granted Nov. 13, 2019, S257844.)

In *Kingston*, our colleagues in Division One of this district agreed with our opinion in *Hicks* that, contrary to *Dueñas*'s analysis, "due process precludes a court from imposing fines and assessments only if to do so would deny the defendant access to the courts or result in the defendant's incarceration."  (*Kingston*, *supra*, 41 Cal.App.5th at p. 279, citing *Hicks*, *supra*, 40 Cal.App.5th at p. 329.)  Here, as in *Kingston* and *Hicks*, the "imposition of the [restitution fine], assessments and fees in no way interfered with [appellant's] right to present a defense at trial or to challenge the trial court's rulings on appeal . . . .  And their imposition did not result in [appellant's] incarceration."

(*Kingston*, at p. 281; *Hicks*, at p. 329.) Moreover, due process does not deny appellant the opportunity to try to satisfy these obligations. (See *Hicks*, at p. 327.)

Further, we agree with the People that appellant's failure to object to the imposition of the restitution fine or assessments and his failure to assert any inability to pay them (unlike the defendant in *Dueñas*) forfeited the issue on appeal. Generally, where a defendant has failed to object to a restitution fine or court fees based on an inability to pay, the issue is forfeited on appeal. (*People v. Aguilar* (2015) 60 Cal.4th 862, 864 ["defendant's failure to challenge the fees in the trial court precludes him from doing so on appeal"]; *People v. Avila* (2009) 46 Cal.4th 680, 729.) We agree with our colleagues in Division Eight of this district that this general rule applies here to the restitution fine and the assessments imposed under the Penal and Government Codes. (*People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155; but see *People v. Petri*, *supra*, 45 Cal.App.5th at pp. 88–89; *People v. Castellano* (2019) 33 Cal.App.5th 485, 488.)

Finally, even if appellant did not forfeit his argument, we decline to extend *Dueñas*'s broad holding beyond the extreme facts in that case, which are not present here. Dueñas was a disabled, unemployed, and often homeless mother of two young children. Over the course of several years she served jail time because she could not pay the fines imposed in connection with various misdemeanor vehicle offenses. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1162.) Applying a due process analysis to the particular facts before it, the appellate court concluded that "[b]ecause the only reason Dueñas cannot pay the fine and fees is her poverty, using the criminal process to collect a fine she

29

cannot pay is unconstitutional." (*Dueñas*, at p. 1160.) By contrast, the situation in which appellant finds himself—subject to a state prison sentence of 55 years to life on a first-degree murder conviction with a firearm enhancement—simply does not implicate the same due process concerns at issue in the factually unique *Dueñas* case. Appellant, unlike Dueñas, does not face incarceration because of an inability to pay court-imposed fines, fees and assessments. Instead, appellant is in prison because he committed a deliberate and premeditated murder. Even if appellant does not pay the fines and assessments, he will suffer none of the cascading and potentially devastating consequences that Dueñas faced. (See *Dueñas*, at p. 1163.)

## V. Remand Is Necessary to Permit the Trial Court to Exercise Its Discretion to Determine Whether to Strike the Five-year Enhancement for the Prior Serious Felony Conviction

Appellant's sentence includes a five-year enhancement imposed under section 667, subdivision (a)(1) for a prior serious felony conviction.

Senate Bill No. 1393, which amended sections 1385 and 667 to give trial courts the discretion to strike the five-year enhancement under section 667, subdivision (a)(1), became effective on January 1, 2019, after appellant was sentenced in this case. The legislation applies retroactively to cases in which judgment is not yet final on appeal. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 973 [holding Sen. Bill No. 1393 would apply retroactively upon effective date]; see *People v. Brown* (2012) 54 Cal.4th 314, 323 ["[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature

30

intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date"], fn. omitted.)

Prior to Senate Bill No. 1393, section 1385, subdivision (b), expressly prohibited a trial court from striking " 'any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667.' " (*People v. Valencia* (1989) 207 Cal.App.3d 1042, 1045, fn. 2; *Valencia*, at p. 1045 [under § 1385, subd. (b), trial court has no discretion to strike § 667, subd. (a) enhancement].)  Senate Bill No. 1393 eliminated this restriction.

In the context of Senate Bill No. 620, courts have held that remand is required absent a clear indication that the trial court would *not* have reduced the sentence if it had been aware of its discretion to do so.  (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)  The trial court gave no such indication here.  To the contrary, given that the court granted appellant's request to strike the prior conviction pursuant to *Romero* and thus not double appellant's sentence under the Three Strikes law, the record suggests the court may choose to exercise its discretion in favor of leniency on this matter as well.  Accordingly, on remand the trial court may consider whether to exercise its discretion to impose or strike the five-year prior serious felony enhancement under section 667, subdivision (a)(1).

## VI. The Trial Court Is Directed to Correct the Minutes and Abstract of Judgment to Conform to the Trial Court's Oral Pronouncements

At the sentencing hearing in this case, the trial court sentenced appellant to an aggregate term of 55 years to life and imposed a $300 restitution fine (§ 1202.4, subd. (b)) and a $300 parole revocation fine, which was stayed (§ 1202.45).  The trial

court further ordered that appellant and Fleming be held jointly and severally liable for victim restitution in the amount determined for the burial expenses.

However, the minute order from the hearing incorrectly reflects imposition of a probation revocation restitution fine, effective upon the revocation of probation pursuant to section 1202.44. The abstract of judgment contains several errors and omissions as well: It does not reflect the indeterminate sentence of 50 years to life plus five years imposed by the court, but instead shows only 25 years to life for the firearm enhancement under section 12022.53, subdivision (d) plus five years for the prior serious felony conviction enhancement under section 667, subdivision (a)(1), and it omits the 25 years to life sentence for murder altogether; the abstract fails to reflect that the court ordered joint and several liability between appellant and Fleming for victim restitution; and, like the minutes, the abstract fails to reflect that the court imposed and stayed a $300 parole revocation fine under section 1202.45, but incorrectly shows a $300 probation revocation fine "now due" under section 1202.44.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3; see also *People v. Jones* (2012) 54 Cal.4th 1, 89 [" '[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize'"].) Discrepancies between the judgment as orally pronounced and as entered in the minutes or abstract of judgment are presumed to be the result of clerical

error (*People v. Mesa* (1975) 14 Cal.3d 466, 471), and an appellate court that has properly assumed jurisdiction of a case has the inherent authority to correct clerical errors in the record to conform to the oral judgment of the sentencing court (*People v. Mitchell* (2001) 26 Cal.4th 181, 185).  Accordingly, the minutes of the February 21, 2018 probation and sentencing hearing and the abstract of judgment must be corrected to conform to the trial court's oral pronouncement of judgment.

**DISPOSITION**

The judgment of conviction is affirmed. The matter is remanded to the trial court for the limited purpose of allowing it to exercise its discretion under Penal Code sections 667, subdivision (a) and 1385, as amended by Senate Bill No. 1393, to strike or impose the five-year prior serious felony enhancement. The trial court is further directed to correct the minutes and abstract of judgment to reflect the court's oral pronouncements and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

34